**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOLORES ROVENKO, Derivatively on Behalf of Nominal Defendant INTEGER HOLDINGS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH W. DZIEDZIC, DIRON SMITH, PAYMAN KHALES, SHEILA ANTRUM, PAMELA G. BAILEY, CHERYL C. CAPPS, MICHAEL J. COYLE, JAMES F. HINRICHS, JEAN HOBBY, ALVIN "TYRONE" JEFFERS, M. CRAIG MAXWELL, FILIPPO PASSERINI, and DONALD J. SPENCE, <br><br> Defendants, <br><br> and <br><br> INTEGER HOLDINGS CORPORATION, <br><br> Nominal Defendant. | Case No. _____ <br><br> JURY TRIAL DEMANDED |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Dolores Rovenko ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Integer Holdings Corporation ("Integer" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Integer, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Pembroke Pines Pension Fund for Firefighters and Police Officers v. Integer Holdings Corp. et al.*, Case No. 1:25-cv-10251-JSR (S.D.N.Y.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Integer against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least July 25, 2024, and October 22, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Integer is one of the world's largest medical device contract development and manufacturing organizations serving in the cardio and vascular, neuromodulation, and cardiac rhythm management markets. Integer primarily manufactures components and devices for medical device companies like Boston Scientific Corporation ("Boston Scientific"), Medtronic plc ("Medtronic"), and Abbott Laboratories. Of Integer's three product lines, its Cardio & Vascular ("C&V") product line makes up most of the Company's revenue.

---

[1] The Individual Defendants are Joseph W. Dziedzic ("Dziedzic"), Diron Smith ("Smith"), Payman Khales ("Khales"), Sheila Antrum ("Antrum"), Pamela G. Bailey ("Bailey"), Cheryl C. Capps ("Capps"), Michael J. Coyle ("Coyle"), James F. Hinrichs ("Hinrichs"), Jean Hobby ("Hobby"), Alvin "Tyrone" Jeffers ("Jeffers"), M. Craig Maxwell ("Maxwell"), Filippo Passerini ("Passerini"), and Donald J. Spence ("Spence"). "Defendants" means Integer and the Individual Defendants.

2

3.      Integer's C&V product line manufactures different kinds of medical devices for Integer's customers, such as catheters and other devices associated with treating heart arrhythmias. Up to and during the Relevant Period, Integer's most promising growth area within its C&V product line was related to the electrophysiology ("EP") field, a branch of physiology that studies the electrical properties of cells and tissues. Within the EP field, a new technology was developed called pulsed field ablation ("PFA"), which employs short, high-energy electrical pulses to treat atrial fibrillation, a common heart arrhythmia.

4.      Throughout the Relevant Period, Individual Defendants touted that Integer's EP business and burgeoning PFA manufacturing were significantly important to the Company, repeatedly emphasizing them as a "tailwind" that would cause increased sales growth "driven by new product ramps in [EP]," which would in turn allow the Company to "outgrow the market" in EP. Similarly, throughout the Relevant Period, the Individual Defendants downplayed the risks associated with the Company's overreliance on its EP business or PFA products, and its overdependence on a few major medical device customers. However, in reality, the Company suffered from numerous delays and issues with its EP business, with Integer failing to meet its product order quotas for PFA devices for its major medical device customers. This lead to, among other things, reduced demand in EP and PFA product orders. Moreover, Integer's PFA devices produced to its customers were riddled with defects, prompting, among other things, the return of thousands of devices and the firing of the Company's entire PFA manufacturing production line.

5.      The truth emerged on October 23, 2025, when Defendant Khales dramatically reduced Integer's fiscal guidance, attributing the reduction to poor demand in three products, of which two were unnamed EP products. The Company also admitted that cratering demand for Integer's products created a "3% to 4% headwind to [Integer's] total company sales for [2026],"

which Defendant Khales made clear was attributable to Integer's two EP products. Moreover, the Company revealed that its "above market growth" would not return until, at earliest, 2027.

6.    On this news, the Company's stock price fell $35.22, over 32%, from a closing price of $109.11 per share on October 22, 2025, to a closing price of $73.89 per share on October 23, 2025, on heavy trade volume.

7.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) Integer's growth was heavily driven by, and dependent on, a single EP product customer and its PFA device orders; (ii) Integer was struggling to ramp up its manufacturing of PFA devices including, but not limited to, the PulseSelect device for Medtronic; (iii) Integer faced significant delays in PFA device production and could not meet the demand for its EP products, including the purchase order from Medtronic; (iv) Integer's produced PFA devices suffered from serious defects that led to their return; (v) demand for Integer to manufacture PFA devices had dissipated; (vi) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

8.    As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Dziedzic, Smith, and Khales in the United States District Court for the Southern District of New York.

9.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying

4

class-wide damages in the Securities Class Action, as well as additional losses including reputational harm and loss of goodwill.

10.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Integer's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

12.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants conduct business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

17. Plaintiff is, and has been at all relevant times, a continuous shareholder of Integer.

*Nominal Defendant*

18. Nominal Defendant Integer is a Delaware corporation with its principal executive offices located at 5830 Granite Parkway, Suite 1150, Plano, Texas 75024. Integer's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ITGR."

*Individual Defendants*

19. Defendant Dziedzic served as a director of the Company from 2013 to October 2025, and as the Company's President and Chief Executive Officer ("CEO") from March 2017 to October 2025. Defendant Dziedzic is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Dziedzic received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $8,675,379 |

| | |
|---|---|
| 2025 | $8,671,332 |

20.     Defendant Smith has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since May 2023. Defendant Smith previously served as the Company's Vice President – Financial Planning & Analysis. Defendant Smith is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Smith received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $2,472,797 |
| 2025 | $2,568,964 |

21.     Defendant Khales has served as a director of the Company and the Company's President and CEO since October 2025. Defendant Khales joined the Company in 2018 and previously served as the Company's Chief Operating Officer ("COO") until he became CEO in October 2025. Defendant Khales also serves on the Company's Technology Strategy Committee. Defendant Khales is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Khales received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $1,907,710 |
| 2025 | $3,211,860 |

22.     Defendant Antrum has served as a director of the Company since 2021. Defendant Antrum also serves as a member of the Company's Audit Committee, Compensation and Organization Committee, and Technology Strategy Committee. According to the Company's public filings, Defendant Antrum received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $269,924 |

| | |
|---|---|
| 2025 | $269,984 |

23.    Defendant Bailey has served as a director of the Company since 2002 and currently serves as the Company's Chair of the Board. Defendant Bailey also serves as a member of the Company's Corporate Governance and Nominating Committee and Technology Strategy Committee. According to the Company's public filings, Defendant Bailey received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $379,979 |
| 2025 | $379,900 |

24.    Defendant Capps has served as a director of the Company since 2021. Defendant Capps also serves as a member of the Company's Corporate Governance and Nominating Committee, Compensation and Organization Committee, and Technology Strategy Committee. According to the Company's public filings, Defendant Capps received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $259,924 |
| 2025 | $259,984 |

25.    Defendant Coyle has served as a director of the Company since July 2025. Defendant Coyle also serves as a member of the Company's Audit Committee, Compensation and Organization Committee, and Technology Strategy Committee. According to the Company's public filings, Defendant Coyle received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2025 | $207,764 |

26.    Defendant Hinrichs has served as a director of the Company since 2018. Defendant Hinrichs also serves as Chair of the Company's Audit Committee and as a member of the

8

Company's Compensation and Organization Committee and Technology Strategy Committee. According to the Company's public filings, Defendant Hinrichs received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $294,114 |
| 2025 | $289,984 |

27.     Defendant Hobby has served as a director of the Company since 2015. Defendant Hobby also serves as Chair of the Company's Corporate Governance and Nominating Committee and as a member of the Technology Strategy Committee. According to the Company's public filings, Defendant Hobby received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $279,206 |
| 2025 | $269,984 |

28.     Defendant Jeffers has served as a director of the Company since 2021. Defendant Jeffers also serves as a member of the Company's Audit Committee, Corporate Governance and Nominating Committee, and Technology Strategy Committee. According to the Company's public filings, Defendant Jeffers received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $269,924 |
| 2025 | $269,984 |

29.     Defendant Maxwell has served as a director of the Company since 2015. Defendant Maxwell also serves as Chair of the Company's Technology Strategy Committee and as a member of the Company's Audit Committee and Corporate Governance and Nominating Committee. According to the Company's public filings, Defendant Maxwell received the following

9

compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $269,924 |
| 2025 | $276,083 |

30.     Defendant Passerini has served as a director of the Company since 2015. Defendant Passerini also serves as a member of the Company's Audit Committee, Compensation and Organization Committee, and Technology Strategy Committee. According to the Company's public filings, Defendant Passerini received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $269,924 |
| 2025 | $269,984 |

31.     Defendant Spence has served as a director of the Company since 2016. Defendant Spence also serves as Chair of the Company's Compensation and Organization Committee and as a member of the Company's Corporate Governance and Nominating Committee and Technology Strategy Committee. According to the Company's public filings, Defendant Spence received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $279,077 |
| 2025 | $278,885 |

***Non-Party Confidential Witnesses***

32.     This action is based on Plaintiff's review, by counsel, of public documents, including the Amended Complaint ("AC") in the Securities Class Action (ECF No. 41), which contains allegations based on interviews with former Integer and Medtronic employees (referred to herein as "FE1–7") who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a

confidential basis and were described in the AC with sufficient detail to establish their reliability and personal knowledge.

33.    FE1 was a Customer Operations Manager at Integer's manufacturing facility located in Juarez, Mexico (the "Juarez Facility") from 2012 to July 2025. The Juarez Facility was Integer's sole manufacturing facility for Medtronic's PulseSelect™ Pulsed Field Ablation System ("PulseSelect"). FE1 was responsible for customer service and operations, managing revenue reporting and forecasting, and coordinating with Integer's customers, including Medtronic. FE1's responsibilities included overseeing the production of PulseSelect.

34.    FE2 was a Senior Sourcing Manager at Integer from 2024 to 2025. FE2 reported to Integer's Vice President of Strategic Sourcing Laslow Giles.

35.    FE3 was a Senior Supply Cian Manager for Affera at Medtronic from August 2023 to July 2024.

36.    FE4 was a Senior Software Engineering Director at Medtronic from October 2022 to November 2025, and was responsible for scaling and managing teams of seventy engineers and leading Affera, Inc. through acquisition to commercialization at scale. FE4 was previously employed as a Chief Software Architect at Affera, Inc. from July 2014 to October 2022.

37.    FE5 was a Senior Manufacturing Engineer at Medtronic from January 2024 to May 2025. FE5 was responsible for providing engineering support and solutions for the manufacture of Affera devices.

38.    FE6 was a Supply Chain Manager at Medtronic's Billerica, Massachusetts facility from August 2022 to May 2025. FE6 was responsible for leading supply chain operations for the launch of Affera mapping and ablation system and implementing scalable planning systems to support the ramp-up for the Affera Sphere-9 catheter.

39. FE7 was a Reliability Engineer II at Medtronic from October 2024 to December 2025. FE7 was responsible for developing in-process test method validation studies for the Affera ablation catheter disposables and Affera systems.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40. By reason of their positions as officers and/or directors of Integer, and because of their ability to control the business and corporate affairs of Integer, the Individual Defendants owed Integer and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Integer in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Integer and its shareholders.

41. Each director and officer of the Company owes to Integer and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Integer, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43. To discharge their duties, the officers and directors of Integer were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Integer, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

46.    To discharge their duties, the officers and directors of Integer were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Integer were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Integer's own Code of Conduct;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so

13

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Integer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Integer and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Integer's operations would comply with all applicable laws and Integer's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47.    Each of the Individual Defendants further owed to Integer and the shareholders the duty of loyalty requiring that each favor Integer's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

48.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Integer and were at all times acting within the course and scope of such agency.

49.    Because of their advisory, executive, managerial, and directorial positions with Integer, each of the Individual Defendants had access to adverse, non-public information about the Company.

50.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Integer.

## INTEGER'S CODE OF CONDUCT

51.    The Company's Code of Conduct states that:

Our Code of Conduct (our "Code"), aligned with our vision and values, guides us on how we should act at work. Our Code serves as a living resource for you in support of day-to-day decision making. Our Code represents the core of how we create a solid foundation of trust and success that is reflected in our relationships with customers, suppliers, stockholders and each other. The Integer Code is applicable to all associates, officers and directors. We will use reasonable efforts to ensure that temporary associates, contractors and consultants, as well as anyone we authorize to act on Integer's behalf, are compliant with our Code.

52.    Under a section titled "Purpose of the Code," the Code of Conduct states, in relevant part:

Our Code establishes the basic foundation of Integer's ethics as it:

- Communicates our ethical philosophy and commitment to all associates, customers, other stakeholders and the communities in which we do business.
- Obliges us to comply with laws, regulations and company policies.

15

- Ensures that integrity and ethics are maintained in all business relationships.
- Serves as a resource when questions of legal or ethical appropriateness arise – not as a comprehensive rulebook, but rather a statement of how we commit to do business.
- Encourages ethical decision-making and discussions to improve how we deal with concerns we encounter every day at work.
- Sets the foundation for our existing policies and processes.

It's up to each of us to uphold the highest standards of integrity and set the example for expected workplace behaviors. Integer expects you to follow both the spirit and the letter of the Code in all company matters, which means you should:

- Understand the Code and seek advice when you need clarification. Understanding the Code is a mandatory part of your job.
- Conduct business ethically and act in accordance with our vision, values and the Code.
- Follow the applicable legal requirements of all countries and locations in which we do business.
- Speak up if you have concerns or suspect violations of the Code, laws, regulations or Integer policies.

This Code does not cover every issue or situation you may encounter at the company. Use our Code as a guide in addition to other Integer policies and procedures. You are expected to use good judgment and seek guidance if you need clarification. . . .

As a global company, our Code applies everywhere we do business, subjecting our company to the laws and regulations specific to those locations. All associates, and those acting as agents on behalf of the company, must respect and comply with our Code, Integer policies and procedures, and with applicable laws and regulations in the countries, states, counties and cities and any other jurisdiction in which Integer conducts business. In some regions, local laws, regulations or business requirements may be stricter than the policies set forth in this Code. In those cases, we expect you to follow the local laws, regulations or business requirements. In those instances where the Code appears to be in violation of an applicable law or regulation, that law or regulation will supersede the Code. . . .

We are committed and accountable to our Code. However, for those who choose to violate our Code, disciplinary actions, up to and including potential termination of employment or other appropriate consequences, may be taken for associates as well as non-associates in accordance with local laws. The disciplinary action given upon a violation of our Code will depend on the type of violation and the severity of the violation. Where violations of our Code are also in violation of a law, you may be subject to other legal liability.

53.    Under a section titled "Living our Vision and Values," the Code of Conduct states,

in relevant part:

> Integer leaders have the ability to strongly influence the culture of their teams and encourage others to "do the right thing," enabling us to live our vision and values to the fullest.
>
> The actions of Integer leaders must clearly demonstrate our commitment to our values, promoting an environment where compliance is expected and ethical behavior is the norm. Leaders, by virtue of their positions of authority, must be role models. An important part of a leader's responsibility is to exemplify our values and exhibit the highest standards of integrity. Leaders must:
>
> - Act with honesty and fairness.
> - Create an open-door environment where associates feel comfortable asking questions or voicing concerns without fear of retaliation.
> - Make sure your direct reports understand and follow the Code, laws, regulations and company policies.
> - Communicate the seriousness of our company's expectations for ethical conduct.
> - Hold everyone accountable for making sound, ethical decisions.
> - Support associates who, in good faith, raise concerns or cooperate in investigations.
> - Be alert to any situations or actions that may be unethical or potentially damaging to our reputation.
> - Take prompt action and raise any concerns or suspected violations of the Code, laws, regulations or company policies.

54.     Under a section titled "Maintaining Accurate Records," the Code of Conduct states,

in relevant part:

> Accurate and reliable records are crucial to our business. We must ensure that the accounting and financial records of our company meet the highest standards of accuracy and completeness. Reporting accurate, complete and understandable information about our business, earnings and financial condition is an essential responsibility of each associate. We are committed to maintaining accurate company records and accounts to ensure legal and ethical compliance and to prevent fraudulent activities. We are responsible for ensuring that the information we record, process and analyze is accurate and recorded in accordance with applicable legal and accounting principles. We also must ensure that our records are secure and readily available to those with a need to know the information on a timely basis. . . .
>
> All company records are expected to be complete, accurate and reliable. There is never a reason to make false or misleading entries. Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are

17

prohibited. All records are the property of Integer and should be retained in accordance with our policies. We do not destroy official company documents or records before the retention time expires. We do destroy documents, in accordance with applicable law, when they no longer have a useful business purpose and their retention time has expired.

Investors count on us to use and provide accurate information so they can make informed investment decisions. The following activities are not allowed:

- Maintaining undisclosed or unrecorded funds or assets for any purpose.
- Making, or asking others to make, false or misleading entries on an expense report, time sheet or any other report.
- Giving false quality or safety results.
- Recording false sales or recording sales outside of the time period they actually occurred.
- Understating or overstating known liabilities and assets.
- Delaying the entry of items that should be current expenses.
- Hiding the true nature of any transaction.
- Providing inaccurate or misleading information for company benefit programs.
- Entering into "side deals" with customers that are not properly recorded or disclosed on our books or records.

Any document you prepare or sign must be correct and truthful. We rely on you to come forward if you feel you are being pressured to prepare, alter, conceal or destroy documents in violation of our company policy. In addition, you must report if you believe someone has made a misleading, incomplete or false statement to an accountant, auditor, attorney or government official in connection with any investigation, audit, examination or filing with any government agency or regulatory body.

55.     Under a section titled "Avoiding Conflicts of Interest," the Code of Conduct states,

in relevant part:

We expect all associates to conform to the highest ethical and legal standards and refrain from any activity or personal interest that might appear to be a "conflict of interest." A conflict of interest occurs when a personal interest interferes, or appears to interfere, with the interests of the company as a whole. A conflict of interest can arise whenever you take action, or have an interest that interferes with your performance of company duties or responsibilities. You should never use, or attempt to use, your position at the company to obtain an improper personal benefit, or for the benefit of a family member, or any other person.

The way you behave in our business relationships impacts our reputation and the trust we maintain with our stakeholders. By discouraging and avoiding conflicts of interest, we send a clear message about our commitment to integrity and our

determination to do what is right. We require you to proactively and promptly disclose actual or perceived conflicts of interest.

Each of us must identify potential conflicts of interest or the appearance of conflicts of interest when they arise and bring them to the attention of your manager or a member of management, Human Resources or Legal departments to ensure a fair and prompt resolution. If you are considering undertaking any activity that might create an appearance of a conflict, you must disclose the activity in advance to your manager and discuss with the Human Resources or Legal departments when applicable.

56.    Under a section titled "Insider Trading," the Code of Conduct states, in relevant part:

Our company shares information openly with you. At times, you may receive confidential company information before it is made publicly available to investors. Information is considered non-public if it has not been adequately disclosed to the public. Information is not considered public until the second business day after it has been disclosed to the public. Some of that information may be considered significant, or "material," and could be important to an investor deciding to buy, sell or hold securities, such as Integer stock. You must not use confidential information for personal benefit, to trade securities based on material, non-public information or provide inside "tips" to others, including family and friends.

57.    Under a section titled "Investor and Media Inquiries," the Code of Conduct states, in relevant part:

Only designated Integer spokespeople are authorized to speak with the media, investors and industry analysts on behalf of our company, in accordance with local laws. Unless authorized, do not implicitly or explicitly give the impression that you are speaking on behalf of Integer in any public communication, including posts to online forums, social media sites, blogs, chat rooms and bulletin boards. This policy also applies to comments to journalists about specific matters related to our businesses, as well as letters to the editor and endorsements of products or services.

58.    In addition to its Code of Conduct, Integer maintains a Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code of Ethics") that imposes additional responsibilities and obligations on certain of the Company's officers. The Code of Ethics states, in relevant part:

In addition to being bound by all other provisions of the Code of Conduct, the Chief

19

Executive Officer (CEO) and the Chief Financial Officer (CFO), Treasurer, Corporate Controller and other senior financial officers performing similar functions who have been identified by the CEO (collectively, the "Senior Financial Officers") are subject to the following additional specific policies:

1. The CEO and all Senior Financial Officers are responsible for full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company. Accordingly, it is the responsibility of the CEO and each Senior Financial Officer promptly to bring to the attention of the General Counsel, Chief Ethics and Compliance Officer or the CEO any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or communications.

2. The CEO and each Senior Financial Officer shall promptly bring to the attention of the General Counsel, Chief Ethics and Compliance Officer or CEO any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO and each Senior Financial Officer shall act with honesty and integrity in the performance of his or her duties at the Company, and shall comply with laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the conduct of the Company's business and the Company's financial reporting.

4. The CEO and each Senior Financial Officer shall promptly bring to the attention of the General Counsel, Chief Ethics and Compliance Officer or the CEO any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or any violation of the Code of Conduct or these additional procedures.

5. The CEO and each Senior Financial Officer shall avoid actual or apparent conflicts of interest between personal and business relationships, such as holding a substantial equity, debt, or other financial interest in any competitor, supplier or customer of the Company, or having a personal financial interest in any transaction involving the purchase or sale by the Company of any products, materials, equipment, services or property, other than through Company-sponsored programs. Any such actual or apparent conflicts of interest shall be brought to the attention of the General Counsel, Chief Ethics and Compliance Officer or the CEO.

6. The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Conduct or these additional procedures by the CEO and the Company's Senior Financial Officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Conduct and these additional procedures, and may include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits and termination of the individual's employment.

## INTEGER'S AUDIT COMMITTEE CHARTER

59.    Integer's Audit Committee Charter states, in relevant part, that:

The purpose of the [Audit] Committee is to carry out the responsibilities delegated to it by the Board relating to the oversight of:

- the Company's financial reporting systems and procedures;
- the integrity of the Company's financial reporting and internal control systems;
- the Company's compliance with legal and regulatory requirements of the New York Stock Exchange ("NYSE"), the Securities and Exchange Commission (the "SEC") and other applicable laws;
- the oversight of financial and cybersecurity risk issues;
- the qualifications, performance and independence of the Company's registered public accounting firm; and
- the performance of the Company's internal audit function.

To fulfill its oversight role, the [Audit] Committee relies on:

- the Company's management for the preparation and accuracy of the Company's financial statements;
- the Company's management for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws, regulations, and listing requirements; and
- the Company's independent auditors for an unbiased, diligent audit or review of the Company's financial statements and internal controls.

60.    Under a section titled "Key Responsibilities," the Audit Committee Charter states,

in relevant part:

The following functions shall be the common, recurring activities of the [Audit] Committee, and are set forth as a guide with the understanding that the [Audit]

21

Committee may diverge from this guide as appropriate. The [Audit] Committee, bearing in mind the Company's commitment to diversity and inclusion, shall have the following authority and responsibilities: . . .

8. To review and discuss with the Company's independent auditors and management (i) any audit problems or difficulties, including difficulties encountered by the Company's independent auditors during their audit work (such as restrictions on the scope of their activities or their access to information); (ii) any significant disagreements with management; and (iii) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's auditors and management. . . .

10. To develop and recommend to the Board for approval a Company policy for the review and approval of related party transactions and to review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) and any other potential conflict of interest situations on an ongoing basis in accordance with the Company's policies and procedures. . . .

12. To review with management and the Company's independent auditors: the adequacy and effectiveness of the Company's financial reporting processes; internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures; and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures. . . .

14. To review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") to be included in the Company's Annual Report on Form 10-K before the report is filed. This review will also encompass all related internal controls reports and certifications as required by the Sarbanes-Oxley Act of 2002 (Sections 302, 404 and/or 906).

15. To review, if significant, relevant reports or financial information submitted by the Company to any governmental body or the public.

16. To recommend to the Board that the audited financial statements and the MD&A section be included in the Company's Annual Report on Form 10-K and produce the audit committee report required to be included in the Company's proxy

statement.

17. To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under the MD&A to be included in the Company's Quarterly Report on Form 10-Q before the report is filed; and to review and discuss the Form 10-Q for filing with the SEC. . . .

19. To review with the head of the Company's internal audit department any significant difficulties, disagreements with management, or scope restrictions encountered in the course of internal audit's work.

20. To review and discuss with management and the Company's independent auditors the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma or adjusted non-GAAP information, before their release to the public, and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. . . .

22. To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

23. To review and discuss with management and the internal audit department the major financial and cybersecurity risks faced by the Company and the policies, guidelines and processes by which management assesses and manages these risks, and the steps management has taken to monitor and control such exposures.

24. To consider the risk of management's ability to override the Company's internal controls.

25. To review legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries, that could have a significant impact on the Company's financial statements.

26. To review with management the status, adequacy and effectiveness of the Company's Information Technology and cybersecurity governance, strategy, policies, procedures, disaster recovery plans and security issues, to receive periodic updates from the Company's Chief Information Officer on relevant cybersecurity risks, incidents and incident resolution, and to review and discuss with management disclosure related to cybersecurity to be included in the Company's SEC reports on Forms 10-K, 10-Q and 8-K before any such report is filed. . . .

29. To carry out any other duties that may be delegated to the Committee by the

Board from time to time.

## SUBSTANTIVE ALLEGATIONS

*Background*

61.    Integer is one of the world's largest medical device contract development and manufacturing organizations serving in the cardio and vascular, neuromodulation, and cardiac rhythm management markets. The Company's customers are multi-national original equipment manufacturers ("OEMs") that develop medical devices for regulatory approval and commercial distribution. Integer primarily manufactures medical devices for its OEM customers, contracting with them to manufacture either finished medical devices or specific components for medical devices.

62.    Integer operates its business in one reportable segment with revenue derived from three product lines: (i) C&V, (ii) Cardiac Rhythm Management & Neuromodulation, and (iii) Other Markets. The Company's C&V product line comprises roughly 60% of the Company's total revenue and is a major source of Integer's profits. The C&V product line produces medical devices such as catheters, heart failure products, wire-based technologies to diagnose and treat cardiac disease, and other devices used for treating artery diseases and neurovascular stroke. The C&V product line also produces clinical application products supporting procedures in interventional cardiology, structural heart, and EP.  As discussed below, during the Relevant Period, Integer increasingly looked to EP devices to drive growth, particularly with a new type of EP technology known as PFA.

63.    Integer had been building its presence in the EP market for many years, but its reliance on EP products accelerated shortly before the Relevant Period as developments in technology moved the EP industry to more sophisticated and high-margin PFA products. Between 2023 and 2024, EP devices underwent a technological revolution. Integer's OEM customers began

24

to develop PFA devices that used brief, high-energy electrical pulses to treat atrial fibrillation. In turn, the medical industry became increasingly focused on integrating EP devices with PFA technologies to effectuate a more seamless cardiac procedure.

64.    Integer's strategic entry into the PFA segment accelerated in 2024 as the technology achieved regulatory approvals and moved towards broad commercialization. In early 2024, the Company touted PFA as a "targeted growth market" and key driver of revenue growth. Despite not branding its own devices or publicly discussing its business with specific OEM customers, Integer held itself out as a key manufacturer of components, sub-assemblies, and finished devices for the PFA industry. Integer highlighted increases in revenue from PFA products, telling investors that the Company was seeing "very strong" growth in its EP business driven by PFA-related devices and emphasizing its "great visibility" into customer demand for all products, including PFA products.

65.    Integer's largest OEM customers include Medtronic, Abbott Laboratories, and Boston Scientific—three of the largest medical device companies in the world—who collectively accounted for nearly half of Integer's revenues. Integer thus sought to maintain strong connections with these OEM customers, including by ensuring that they received high-end, manufactured products and sufficient attention to their orders. Accordingly, Integer's relationships with Medtronic, Abbot Laboratories, and Boston Scientific were critical to the Company's financial performance and future prospects, particularly for novel medical devices like PFA.

66.    The Company also understood the risks that could result if Integer's relationships with these major medical device companies deteriorated. As Integer acknowledged in its February 20, 2025 Annual Report, "[t]he loss of a significant amount of business from any large customer" would materially impact the Company's financial condition and operations. The Company also

25

warned that Integer "depend[s] heavily on a limited number of customers, and if we lose any of them or they reduce their business with us, we would lose a substantial portion of our revenues.

67. Nevertheless, while Integer reported that Medtronic, Abbott Laboratories, and Boston Scientific were its three largest customers, the Company did not disclose which specific products or components it made, or which customers it made them for. Therefore, analysts and shareholders relied upon Individual Defendants' representations about Integer's growth and success in product lines and markets to determine the strengths and weaknesses of the Company, as they did not have more detailed information about specific devices or device component, including for PFA or other EP products.

68. By the start of the Relevant Period, there were only two U.S. Food and Drug Administration approved PFA systems: (i) FARAPULSE™ PFA System ("Farapulse"), developed by Boston Scientific and (ii) PulseSelect, developed by Medtronic. Unbeknownst to investors, Integer manufactured PulseSelect, which competed with Boston Scientific's Farapulse, and Medtronic expected Integer to provide large volumes of PulseSelect product to satisfy end-user demand after PulseSelect received regulatory approval and was ready for commercial launch.

69. Thus, leading up to the Relevant Period, investors were intently focused on the burgeoning PFA industry as a major driver of Integer's future growth, viewing Integer as well-positioned to capitalize on its relationships with the major PFA system providers.

### Individual Defendants' Materially False and Misleading Statements

70. On July 25, 2024, the Company held an earnings call for analysts and investors discussing its results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Dziedzic touted the Company's EP business and PFA products as key growth drivers for the Company, stating, in relevant part, that "*if you look at our past four*

26

*quarters, our electrophysiology business*, although we don't report the specific number, *it's grown at 1.5 times the market growth rate*."[2]

71.     Later during the 2Q24 Earnings Call, when asked about Integer's "direct exposure to growth" in PFA products, Defendant Dziedzic affirmed that PFA would be a significant "tailwind" to the Company's overall performance while downplaying any risks to the Company's growth that overreliance on PFA products could pose stating, in relevant part:

> I don't know that I would characterize dramatic, because I'm reflecting on total Integer and our commentary that *no one part of our business or one program is going to materially, meaningfully drive the company. I will say, yes, PFA, we have strong visibility to the pipeline, multi-generation product development plans, and we know which ones we're on and which ones we're working to get on. So we do have very strong visibility, and we absolutely expect PFA as a therapy to be a tailwind.*

72.     When asked about the "incremental contribution from PFA" toward growth in Integer's C&V product line, Defendant Dziedzic emphasized the Company's above-market growth in the EP industry, stating, in relevant part, "we're very excited about our C&V business. *Electrophysiology and structural heart in particular, they're growing faster than the market. We measure our customer sales, we aggregate that, we look at what the market's growing at, and we're growing faster than the market in those two important segments*."

73.     When asked about "has anything changed at your OEM customers with respect to their end market curves," Defendant Dziedzic stated, in relevant part:

> *We have not seen any material meaningful change in customer expectation when you look out. I'll frame it into 2025 and beyond*, given your question about longer-term. I mean, sitting here with almost $900 million of order book, we were expecting that order book to start to come down, because there are some components or some elements of that higher order book that are connected to the exit of our Portable Medical business, to the strong demand in guidewires that we ask customers to place orders much further in advance given the capacity coming on. We still expect the order book to come down. I would have expected the order

---

[2] Unless otherwise stated, all emphasis is added.

book to come down a little sooner than it has. ***And I think that points to the continued strength in the market, continued high expectations of our customers for growth. They continue to place orders further into the future, and it gives us tremendous visibility. So I think our customers remain very, very optimistic about their most exciting programs that they're bringing to the marketplace***, and the overall market growth rates continue to show optimism. ***And I look to our order book, and I look to the order patterns very much in line with what we expected entering the year, and they've continued***.

74.     On September 4, 2024, the Company's management presented at the 2024 Wells Fargo Healthcare Conference (the "2024 Wells Fargo Conference"). During the 2024 Wells Fargo Conference, analysts asked about the dynamics the Company faced with PFA within its EP portfolio, noting that "a large part of the growth we're seeing right now in the EP market is really the ASP uplift from PFA," and seeking to learn how Integer captured value form "increased content and more procedures. In response, Defendant Dziedzic focused on the growth of Integer's EP portfolio and how the Company was "outperforming in that space," stating, in relevant part:

> Yeah. So, maybe I'll answer it this way. And I think I shared this on our last earnings call, ***our electrophysiology portfolio products. So, this is access diagnostics and ablation, is growing at 1.5 times the market rate over the last four quarters. Now, when I say that, that includes half a year last year and the first half of this year. And we know the two devices that are approved in the US were approved at year end and beginning of this year, last year. But we're growing faster than the market our portfolio of EP products. And so, we feel like we're outperforming in that space and we expect that to continue for the foreseeable future.***

75.     On October 24, 2024, the Company held an earnings call for analysts and investors to discuss its third quarter results for 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Dziedzic spoke about the growth potential of Integer, stating that the Company was "***confident in [its] ability to deliver strong sales growth***" given the Company's "***high visibility to customer demand, including ramping programs in high growth markets***."

76.     Later during the 3Q24 Earnings Call, when an analyst asked about trends in the EP business, Defendant Dziedzic responded by affirming new product ramps in EP were driving

Integer's above-market growth, stating, in relevant part:

> ***So, electrophysiology is an exciting high growth market***. We are highly vertically integrated. We have a very strong position and footprint across the full procedure. And we expect it to continue growing and we expect to be a strong participant. ***And so our outlook hasn't changed every day. I think it just gets -- it gets brighter and brighter with the industry's progress. But I'll just highlight, it's one of many growth factors for us and I would not expect any one product or end market to be the single biggest driver or materially change the company outlook***. So it's in our guidance. As we continue to work with customers on their new product rollouts, we continue to factor that into our outlook. ***Our electrophysiology business continues to outperform the market***. We track our customers' reported sales by end market. ***We then look at our sales by those end markets and we're still growing 1.5-ish times the end market growth rate on a trailing four quarter basis and we expect that to continue to accelerate as more-and-more products come to market***.

77.     When asked by an analyst whether the Company's accelerating PFA sales could weigh on Integer's legacy EP business and require an "inventory work down" on traditional energy products, Defendant Dziedzic responded by downplaying this concern and affirming PFA's as a "net tailwind" to Integer's EP business stating, in relevant part:

> Our customers continue to be very optimistic about the broader electrophysiology marketplace. ***And given our broad footprint and participation across the full procedure, and given our significant vertical integration, we think we're incredibly well-positioned to support the industry during this transition and help our customers bring products to-market as fast as we all can*** on a safe basis. So we remain excited and don't—haven't seen any meaningful shift beyond what you're hearing and seeing in the—in the broader industry. ***And as we look at electrophysiology, given our broad footprint and vertical integration, we see it as a net tailwind for the company for sure***.

78.     On December 3, 2024, the Company's management presented at the Piper Sandler 36th Annual Healthcare Conference (the "Piper Sandler Conference"). During the Piper Sandler Conference, when responding to a prompt from an analyst to "talk a little bit about the EP opportunity," Defendant Dziedzic reiterated how PFA was a "tailwind" for Integer and major source of growth, stating, in relevant part:

> Pulsed field ablation specifically gives us the opportunity to have more content on the ablation catheter step of the procedure, which helps us – contributes to our

viewing *pulsed field ablation and electrophysiology holistically as a tailwind for us*. I commented on our last earnings call that we've been growing the last four quarters, which is how we measure our business to take out the noise of individual quarters. But *we've been growing 1.5 times the industry growth rate in electrophysiology and we expect that to continue and even accelerate moving forward given our vertical integration capability and the continued growth in PFA*.

79.     On February 20, 2025, the Company issued a press release reporting its financial results for the fourth quarter and full year of 2024 (the "4Q24 Press Release"). In the 4Q24 Press Release, the Company stated that "*Cardio & Vascular (C&V) sales increased 15% in the fourth quarter 2024 compared to fourth quarter 2023, driven by new product ramps in electrophysiology* and the Pulse acquisition." The 4Q24 Press Release also stated that "*[f]ull year sales increased 14% year-over-year, with strong growth across targeted C&V markets, driven by electrophysiology*, structural heart, and the InNeuroCo and Pulse acquisitions."

80.     Defendant Dziedzic was also quoted in the 4Q24 Press Release discussing the Company's 2025 guidance stating that "[w]e expect 8% to 10% sales growth in 2025 and adjusted operating income to grow 11% to 16%. We continue to execute our strategy by launching new products and adding capabilities in targeted growth markets."

81.     On the same day, the Company held an earnings call for analysts and investors to discuss its results for the fourth quarter and full year 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Smith reiterated the strong performance of the Company's C&V product line, emphasizing the new product ramps in EP, stating that "*[f]or our Cardio & Vascular product line, trailing 4-quarter sales increased 14% year-over-year with strong growth across targeted C&V markets*," which "*was driven by new product ramps in Electrophysiology* and Structural Heart and the performance of our INeuroCo and Pulse acquisitions."

82.     During the question-and-answer portion of the 4Q24 Earnings Call, when asked

whether there was anything holding the Company back from major growth in its C&V product line, Defendant Dziedzic stated, in response, "***So, we absolutely do expect Cardiovascular to continue to have very strong growth given our success in the various targeted high-growth markets***."

83.    When asked more directly why the Company could not "maintain C&V growth closer to the mid-teens versus the low double digits that you're expecting?" Defendant Dziedzic focused on the Company's continued growth in the critical EP industry and that the Company could return to low the double-digit growth range, stating, in relevant part, that "***[w]e're still outgrowing the market meaningfully in Electrophysiology*** and Structural Heart, ***and those are big contributors***. . . . ***Low double-digit kind of has a range that could creep up into the range in the area that you're pointing to***."

84.    On March 5, 2025, the Company's management presented at the Raymond James Institutional Investors Conference (the "Raymond James Conference"). During the Raymond James Conference, when asked about customer concentration risks for the Company, Defendant Dziedzic acknowledged that Integer's top three customers represented nearly half of the Company's 2024 sales, but reiterated that any one customer or product was "a meaningful driver" for the Company's growth stating, in relevant part:

> Yeah. This is a common question. So our top three customers in alphabetical order, Abbott, Boston Scientific, Medtronic, they're all three of them are 10% or more sales. So we have to publicly disclose those three. It's about 47% of our sales in 2024. As a percent of sales, they look like they're significant. We think that because we serve the whole industry, we think that's representative of their position in the industry as the three biggest players in Medtech. Way to think about it is we have hundreds of different programs with each of those customers. We serve each of those customers in the business unit and the markets that we serve. . . .
>
> And it's spread across many end markets. It's spread across hundreds of different programs. And so although it looks like concentration, it's actually very diversified. ***And there's no single program that's a meaningful driver of the entire company.***

31

We've talked about that a lot. ***And I think that diversification is a strength of ours***.

85.    On March 19, 2025, the Company's management presented at the 2025 KeyBanc Capital Markets Healthcare Forum (the "KeyBanc Conference"). During the KeyBanc Conference, an analyst asked about "agnostic" the Company was to potential changes in market share in PFA and if there were major differences for Integer depending on who captures the most incremental share. Defendant Dziedzic responded by stating PFA was a "tailwind" driving Integer's above-market growth and how the Company was well-positioned to take advantage of the introduction of PFA, stating, in relevant part:

> And we are agnostic to how we're helping customers or whose device it is. ***We believe we have the capability to help everyone in the industry for – accelerate the introduction of pulsed field ablation*** and EP more broadly***.*** At the end of the day, electrophysiology is no different than any of the other end markets we serve. We have different amounts of content on different customers' devices. And so, the direct answer is, it always matters who wins in terms of the content we have. I'd love to say we have 100% with everybody. That's just not realistic.
>
> And so, it certainly does matter***. But we feel we are well-positioned to continue to support the electrophysiology market growth. We're well-positioned to help our customers continue to evolve the therapy, specifically pulsed field ablation and that it's a tailwind for us. We've been outgrowing the market and we expect to continue to outgrow the market in electrophysiology.***

86.    On April 7, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy"). The 2025 Proxy assured investors that the Company was sufficiently overseeing risks to the Company, and that the Company had internal controls in place, stating, in relevant part:

> The Company has an enterprise risk management program implemented, including with respect to cybersecurity matters, by members of the Company's senior management. Enterprise risks are identified and their mitigation is prioritized by Company management. The enterprise risk management program as a whole and various components thereof is subject to oversight and review by the Board and its committees.
>
> It is the responsibility of the Corporate Governance and Nominating Committee to

oversee the Company's enterprise risk management program, which is periodically reviewed with the full Board, and that the Company's risk management assessment is reviewed with management. It is the responsibility of the Audit Committee to oversee the financial risks faced by the Company, and, more specifically, to review and discuss with management and the internal audit department these financial risks and consider the risk of management's ability to override the Company's internal controls. Additionally, the Company's Chief Information Security Officer provides updates to the Audit Committee, at least twice each year, on cybersecurity risks, incidents and incident resolution (with any incidents of significance being reported at, or prior to, the Audit Committee's next meeting). As part of the Company's efforts to mitigate cybersecrurity risks, it provides annual mandatory cybersecurity awareness and information handling training to all associates. The Compensation Committee has responsibility for overseeing the relationship between risk management policies and compensation and to evaluate compensation policies in light of these risks.

The Board as a whole has oversight responsibility for the Company's strategic risks. Throughout the year, management regularly reports on each identified enterprise risk to the relevant committee or the Board. In addition to updates provided to the Audit Committee, at least once each year, the Company's Chief Information Security Officer also provides information on cybersecurity risks and the Company's approach to protecting the Company's data and systems infrastructure to the Board. In the event of a material cybersecurity event, management would notify Board members, as appropriate, and, in compliance with our procedures and established management-level committees, determine the timing and extent of the response and public disclosure and whether any future vulnerabilities are expected. Additional review or reporting on enterprise risks is conducted as needed or as requested by the Board or a committee. Allocating various aspects of risk oversight among the committees encourages the independent directors to be fully engaged in the risk oversight responsibilities of the Board. Also, we believe that the separation of the Chair of the Board and CEO roles further supports the Board's risk oversight role.

87.    On April 24, 2025, the Company issued a press release reporting its first quarter results for 2025 (the "1Q25 Press Release"). In the 1Q25 Press Release, the Company stated, in relevant part, that "***Cardio & Vascular sales increased 17% in the first quarter 2025 [compared to the first quarter 2024], driven by new product ramps in electrophysiology*** and . . . acquisitions."

88.    On the same day, the Company held an earnings call for analysts and investors to discuss its results for the first quarter of 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, when asked about the strength of the EP industry for Integer and the growth in the

Company's C&V product line relative to the market, Defendant Dziedzic stated, in relevant part, that "*electrophysiology does continue to outgrow the markets very nicely there. . . . [P]ulsed field ablation is also an opportunity for us as we get higher -- we're getting higher content on average on the ablation catheter in that step*," and that EP "*continues to be a strong contributor to our growth. We are growing above the market*."

89.    On May 14, 2025, the Company participated in the Bank of America Securities 2025 Healthcare Conference (the "BofA Conference"). During the BofA Conference, in response to an analyst's question about "what was really driving" the Company's reported 6% organic growth, Defendant Dziedzic indicated that the growth in the C&V product was driven by "new product launches," stating, in relevant part, that "*[w]e're seeing the growth in the end markets that we've targeted, the new product launches that are -- that have been driving the growth, continue to drive the growth and have confidence as we look forward to the rest of the year*."

90.    Later during the BofA Conference, in response to a question about the Company's "growth algorithm" for its "$1 billion" C&V business, specifically the relative contribution in EP between PFA products versus more traditional products, Defendant Khales reiterated PFA as a "tailwind" for the Company's growth across the EP market, stating, in relevant part:

> So I think that just as a context, we have a very broad range of capabilities and a broad range of participation in the different products in the core markets that we participate. Why that matters is you give the example of PFA. Obviously, that's a general grower in the market right now. So let me talk about that for a moment. **PFA is a tailwind for us because it is driving growth in the market**. We participate in almost every aspect of a procedure. Anything from access from the beginning to when you do a transseptal crossing, we have participation in that with different customers. When you do that, when you do diagnostics, for example, when you do the actual ablation itself, we participate in all of that. So when that industry grows, again, that's all part of our strategy to make sure that we are a very strong player in those core markets. **So we've had these participations for a number of years. So when there's a tailwind, obviously, that drives growth everywhere right across that market**.

34

91.     On June 17, 2025, the Company's management presented at the Truist Securities MedTech Conference (the "Truist Conference"). During the Truist Conference, when asked about whether C&V's growth was sustainable given that EP was a "big piece of it," Defendant Khales reassured that the PFA market would continue to be a "tailwind" for the Company stating, in relevant part:

> *So, when you think about EP in particular, what's happening in the industry with PFA, it says – it's creating a lot of momentum in the industry, also by extension to us just because we've had such a strong presence in that industry for years. So, we believe that that is a contributor to and that's a tailwind for us in terms of growth.*

92.     Later during the Truist Conference, when an analyst asked about EP and how Integer could "tap into and benefit from that specifically," Defendant Khales again reiterated PFA as a net boon for the Company stating, in relevant part:

> Yeah, let me take that as well. So, without being specific, which I'm sure you understand, our OEM customers do not want us to talk about – or they don't want the market to know who's making the products for them. So, I'm sure you appreciate that. So, I'll be a little bit less specific. But given just maybe some statistics, you're talking about the market growth in general. So, some players in the industry recently mentioned that they believe that the EP market in general can double in size over the next five years to $20 billion. That's a total addressable market for the OEM. *So, obviously, that creates a lot of momentum and tailwind. And just for a company like us that participates in that, that's incredibly helpful*.

93.     On July 24, 2025, the Company issued a press release reporting its financial results for the second quarter of 2025 (the "2Q25 Press Release"). The 2Q25 Press Release highlighted how the Company's C&V product line benefitted from EP stating "*Cardio & Vascular sales increased 24% in the second quarter 2025 compared to the second quarter 2024, driven by new product ramps in electrophysiology*."

94.     On the same day, the Company hosted an earnings call for analysts and investors to discuss its second quarter results for 2025 (the "2Q25 Earnings Call"). During the 2Q25

Earnings Call, Defendant Dziedzic emphasized the Company's 9% increase in sales, 14% increase in operating profit, and the Company's "1.5 times the rate of sales growth." Defendant Dziedzic emphasized the Company's "***strong pipeline of new products concentrated in faster-growing end markets***." Defendant Dziedzic also indicated that the Company was raising its earnings guidance for 2025 because of, among other things, EP stating, in relevant part:

> With the first half now behind us, ***we are raising the midpoint of our adjusted operating income and EPS outlook***. ***We are maintaining our sales outlook midpoint given our high visibility to customer demand while tightening the sales range. At the midpoint of our full year outlook, we expect to grow sales 8.5%, adjusted operating income 14%, and adjusted EPS 20%.***

95.     When asked about the Company's "very strong quarter in C&V" during the 2Q25 Earnings Call, Defendant Khales confirmed that Integer was "outperform[ing] the market" in EP, stating, in relevant part:

> Let me just highlight that we have been present in EP for many, many years. We have built a lot of capabilities over the years. And our participation in EP, I mean, there's a lot of, obviously, a lot of excitement in the market right now with ***EP with PFA, that's kind of driving a lot of growth,*** which is also great for patients. We're very excited about the technology. ***That's been driving – it's been giving us some tailwinds***. I would highlight that our participation in EP is really across the procedure. It's not just only in the ablation technology itself. We participate in access, in guidewires and transseptal sheaths in diagnostics and of course, the ablation itself. So, we have good content across the procedure, and that includes a PFA pulsed field ablation. ***So, we have good momentum in that space, and we've got a strong pipeline. You mentioned whether we are outperforming the market. Yes, we believe we are. If you look at our trailing four quarter within C&V, that is one of the drivers of the growth that we have, and we believe that we are outperforming the market, and we continue to be very excited about the momentum that we have.***

96.     On September 4, 2025, the Company's management presented at the 2025 Wells Fargo Healthcare Conference (the "2025 Wells Fargo Conference"). During the 2025 Wells Fargo Conference, when an analyst noted that PFA-related procedures and product sales were growing approximately "15%" and asked whether Integer was growing at "1.5 times" that rate, Defendant

36

Khales answered in the affirmative stating, in relevant part:

> [A]s the number of procedures grow, we see that that gives us tailwind in general. As it relates to the ablation device specifically – so, the PFA technology is cannibalizing some of the more legacy, RF and cryo technologies, in general. And we see that too in our space. ***But net-net, we're positive on the PFA device itself, on the PFA devices themselves. So, net-net, it's a positive for us. Both for ablation and also everything else that we participate in***.

97. The above statements in ¶¶ 70-96 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) Integer's growth was heavily driven by, and dependent on, a single EP product customer and its PFA device orders; (ii) Integer was struggling to ramp up its manufacturing of PFA devices including, but not limited to, the PulseSelect device for Medtronic; (iii) Integer faced significant delays in PFA device production and could not meet the demand for its EP products, including the purchase order from Medtronic; (iv) Integer's produced PFA devices suffered from serious defects that led to their return; (v) demand for Integer to manufacture PFA devices had dissipated; (vi) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

98. The truth began to emerge on April 24, 2025, when Integer issued the 1Q25 Press Release reporting a 17% increase in C&V sales driven by "new product ramps in electrophysiology," and reaffirmed the Company's full-year guidance, assuring investors that its $800 million order book provided a "fixed guarantee" of above-market growth through at least the end of 2025. However, on the same day, the Company issued a separate press release announcing the sudden "retirement" of Defendant Dziedzic as President and CEO, notifying that Defendant

37

Dziedzic would also step down from the Board and be replaced by Defendant Khales, the Company's then-COO, effective October 24, 2025. No explanation was given for Defendant Dziedzic's sudden departure, only praise for Defendant Dziedzic.

99.    One week later, on May 2025, Dziedzic sold 338,975 shares of Integer stock, roughly 88% of his total vested Integer shares held and acquired during the Relevant Period, generating proceeds of nearly $42 million, leading to windfall profits of roughly $38.6 million.

100.    Defendant Dziedzic made this transaction without any Rule 10b5-1 plan, underscoring the suspicious nature of the sale. Nothing required Dziedzic to sell his stock at this time, let alone in a single day, and no public explanation was given for the sale. Indeed, at the time of the sale, Defendant Dziedzic was scheduled to remain as the CEO and President of Integer for another six months. Moreover, adding to the suspicious nature of the sales, Dziedzic's May 1, 2025, stock sales were not consistent with any prior trading. In fact, Dziedzic had not previously sold any of his stock during his eight-year tenure as CEO.

101.    The truth fully emerged on October 23, 2025, the day before Defendant Dziedzic stepped down as President and CEO of Integer, when the Company announced that EP demand had collapsed. During an earnings call held for analysts and investors that day discussing the Company's results for the third quarter of 2025 (the "3Q25 Earnings Call"), Defendant Khales revealed that Integer "expect[s] sales of [three] new products to decline in 2026," with two of the three being "electrophysiology products." Defendant Khales made clear that the Company's poor outlook was directly attributable to these EP products stating that "[t]he headwinds that we are seeing is related to two [EP] products . . . ." Although the Individual Defendants refused to identify the specific products or customers involved in this sudden news, Defendant Khales stated that "[t]he market adoption of these products has been slower than forecasted." As a result, Integer

reduced its sales outlook for 2025 and projected a substantial "3% to 4% headwind to [Integer's] total company sales for [2026]."

102.    Also during the 3Q25 Earnings Call, Individual Defendants revealed that, as a result of these headwinds, sales growth for the Company was expected to be flat in 2026, with an "organic sales *decline*" in the first half of 2026, a return to at-market growth anticipated in the second half of 2026, and any above-market growth pushed out to 2027 at the earliest. In the slide presentation accompanying the 3Q25 Earnings Call, (the "3Q25 Slide Presentation"), the Company warned investors to "[e]xpect approx. flat 2026 sales, with a return to above-market growth in 2027," and disclosed that organic sales were expected to be "down low single-digit in 1H" of 2026, and only "recover to market growth during 2H" of 2026. The 3Q25 Slide Presentation also disclosed that "C&V sales [would be] flat to up low single-digit, due to a decline in select new products in Electrophysiology." On the 3Q25 Earnings Call, Defendant Khales put it more plainly: Integer expected "a more flattish sales performance in 2026," and admitted that "our 2026 outlook is not where we would like it to be."

103.    On this news, the Company's stock price fell $35.22, over 32%, from a closing price of $109.11 per share on October 22, 2025, to a closing price of $73.89 per share on October 23, 2025, on heavy trade volume.

### *The Individual Defendants Knew, or Should Have Known, That the Company's EP Business Was Declining*

104.    Contrary to suggestions by Individual Defendants that Integer had only learned of the EP decline "during the course of the third quarter," statements from Integer's and Medtronic's former employees reveal that the reversal in Integer's EP business was due primarily to Integer's loss of business form Medtronic for its newly-approved PFA device PulseSelect. This loss of business was not an unexpected development that suddenly occurred in the third quarter of 2025,

but rather due to long experienced issues that Integer faced with manufacturing the PulseSelect device.

105.    By the start of the Relevant Period, the Company was already severely delayed in getting its manufacturing line for PulseSelect up and running; by the end of 2024, Integer could not fulfill anywhere near Medtronic's orders for PulseSelect; by early 2025, Medtronic had declined to place any new orders for PulseSelect and was returning thousands of devices it had already purchased from Integer; and by mid-2025, Integer had shut down its sole PulseSelect manufacturing line and instituted mass layoffs of all employees involved in manufacturing the product. Remarkably, the Individual Defendants never disclosed any of this highly material information to investors. Instead, the Individual Defendants falsely touted Integer's PFA business as a "tailwind" and a "net positive" for Integer even as late as September 2025—two months after the Medtronic PFA manufacturing line had been fully shut down.

106.    FE1 confirmed that the Juarez Facility was the exclusive Integer facility for the assembly of Medtronic's first-generation PulseSelect device. FE1 explained that she was aware of Integer's earnings release on October 23, 2025, wherein the Company disclosed that it expected sales of three new products to decline in 2026, including for two EP products, and that the Company had stated that "market adoption" of these products had been slower than it had forecasted, and that there was decelerating growth "reflecting a decline in the two new [EP] products." FE1 said she was "100%" familiar with these issues due to her position at Integer.

107.    FE1 explained that Medtronic's PFA device was supposed to be the biggest growth product for the Company in 2025. She emphasized that the Medtronic PFA growth opportunity would have been "so tremendous" for Integer had the device made it to market in time to be competitive with other major PFA devices. FE1 advised that Integer had worked on Medtronic's

first PFA device for years, but experienced various issues that resulted in Medtronic being late-to-market with the device. FE1 explained that the research and development in preparation for the manufacturing of Medtronic's PFA device was done at Integer's Plymouth site in 2022 and 2023. Medtronic announced FDA approval of its PulseSelect PFA device on December 13, 2023, by which time FE1 said the Juarez Facility had already begun setting up its manufacturing of the device. However, Integer faced difficulties in getting its manufacturing line ready for the product's launch. FE1 stated that, at the outset of 2024, Medtronic ordered roughly 8,000 PFA units, and then later pushed for Integer to make a total of 14,000 by the end of 2024.

108.    FE1 explained that Integer struggled to make its manufacturing process stables, and as a result, by July 2024, Integer had still not gotten its Medtronic PFA manufacturing line started. Thus, by the beginning of the Relevant Period, Integer was unable to manufacture a single Medtronic PFA device.

109.    FE1 also explained that the Juarez Facility did not begin to manufacture Medtronic PFA devices until September 2024. Nonetheless, even after the Juarez Facility finally began to produce Medtronic PFA devices, the Company still struggled to fulfill Medtronic's 8,000-unit order. As FE1 indicated, in September 2024, the Juarez Facility was only able to produce roughly 60 Medtronic PFA devices per week, and that "by that time [Integer] w[as] already three months late." By the end of 2024, Integer was nowhere near on pace to complete the low-end of Medtronic's initial order, and far short of Medtronic's revised request for 14,000 by the end of 2024. FE1 commented that by the end of 2024, Integer had only made 5,000 units, mostly all finished by the fourth quarter of 2024.

110.    FE1's recounting of the Company's internal struggles is consistent with public statements made by Medtronic's CEO Geoffrey Martha who stated during an earnings call on

41

November 19, 2024, that "our ablation business didn't accelerate as we expected this quarter because of [a] third-party component supplier that experienced an interruption." While Medtronic did not name the supplier at issue, Integer and its Juarez Facility were the sole supplier and manufacturing site for the PulseSelect device.

111.    FE1 also recalled being told by Integer's Vice President of Global Accounts Denise Blasey that Medtronic had a call with Integer before year end 2024 that they would reduce demand for its PFA units for 2025, contrary to Integer's initial expectation of producing 25,000 PFA units for Medtronic that year.

112.    FE1 further explained that Integer's budgeting process began in June and was finalized in September for the upcoming year. In September 2024, Integer management wanted her to include 22,000 Medtronic PFA units in her budget for 2025. At that time, she recalled thinking "I can barely make 60 a week – how are we going to do 22,000?" FE1 further confirmed that at the time, Integer did not have a purchase order from Medtronic for the 22,000 units forecasted for 2025. She only had the POs for 8,000 units from 2024.

113.    Moreover, FE1 recalled that, by Thanksgiving 2024, Medtronic had returned around 1,100 of its Integer-manufactured PFA devices because of claimed defects, and that by the first quarter of 2025, Medtronic wished to return all 5,000 units manufactured in 2024 because of similar defects. FE1 stated that, once Medtronic started returning the PFA products, Integer was having daily calls with Medtronic's Director of Quality to understand lot by lot what defects were being found. FE1 inferred that Medtronic was seeking to get out of its volume commitment with Integer, in part because Medtronic had been late to the market with PulseSelect due to the manufacturing delay, and because Medtronic was now switching focus to their second generation PFA product called "Affera." As she explained, "their [Medtronic's] horse is already gone with

version one and now they are going to focus all of their energy and money into going to next generation."

114.    FE1's recounting of events is further corroborated with testimonials of experts on PFA devices. In October 2024, Medtronic's Affera was approved by the FDA and, as 2025 progressed, Medtronic placed increasing emphasis on Affera over PulseSelect for growth potential, with Affera being described as the "premium" product with "the highest demand," and PulseSelect presented as a secondary, lower cost alternative.

115.    FE1 also stated that by the fourth quarter of 2024, Integer had not received a single purchase order from Medtronic for 2025 for its PFA device. As FE1 recalled, by the beginning of 2025, "it was a regular topic of conversation" that there were still no Medtronic purchase orders for its PFA device for 2025, leaving Integer with only the remaining 2024 purchase orders that had not yet been fulfilled. FE1 said that she was fighting with the other sites in December 2024 because they made components for the Juarez Facility and wanted the Juarez Facility to take them, but it didn't want them "because we [didn't] have a purchase order from the customer." FE1 further explained that normally she would issue purchase orders to the Company's Salem, Virginia facility for parts, but that, by early 2025, because she had received no new purchase orders from Medtronic, the Juarez Facility stopped issuing purchase orders to Salem. She also said that by March 2025, the Company temporarily shut down production of the Medtronic PFA for one week, and that, by this time, the writing was on the wall: the 2025 revenue that Integer wanted from the device was gone.

116.    FE1 explained that Medtronic told Integer in April 2025 that it was going to significantly slow down production of the PulseSelect system. She said that the Juarez Facility alone lost $14 million on anticipated sales because of this initial slowdown in early 2025, but that

the overall revenue impact for Integer was tens of millions of dollars larger because Integer's sister sites were supplying the Juarez Facility with components for the PulseSelect, and the revenue for these components was reported separately. She said that there were three or four sites that were supplying components to make that final product. For example, the expected revenue from the Company's site in Salem, Virginia was $60 million for their precious metals to make certain components. FE1 further recalled that, by the middle of 2025, Medtronic returned the remainder of the initial 5,000 units produced due to purported defects.

117.    Similarly, FE2 had learned of the lack of orders from Medtronic while at the Juarez Facility in June 2025, explaining that FE2 was instructed that Medtronic had "already communicated to Integer" a significant slowdown in PFA orders. Furthermore, in June 2025, FE2 learned that the Company had decided to shut down the entire manufacturing line for Medtronic's PFA device at the Juarez Facility and to fire all of the line's operators. In July 2025, FE2 recounted that Integer did indeed fire all employees responsible for Medtronic PFA production, shutting down the manufacturing line at the Juarez Facility and ceasing production of Medtronic PFA devices. FE1 was among the employees laid off in July 2025 as part of a massive layoff in connection to the Medtronic PFA device line shutdown.

118.    FE1 also described direct involvement in gathering key data points for monthly "Operational Site Review" for the Juarez Facility that was attended by Defendant Khales and other executives on the second Tuesday of every month. FE1 further explained that each site operated as a separate unit and reported their data separately. She stated that she gathered data on the Juarez Facility's operations and revenue forecasts for these monthly site meetings, which was then presented during the virtual calls. FE1's portion of the monthly Operational Site Reviews was the revenue and feedback on any major swings to it. FE1 noted that ordinarily, Operational Site

44

Reviews were normally thirty minutes per site, but that by the second half of 2024, they had swelled to at least an hour for the Juarez Facility because of all of the "drama" around the Medtronic PFA device lines. In fact, there were so many issues around the Medtronic PFA devices that there "came a point" in the "beginning of 2025" that there were so many concerns about meeting Medtronic PFA revenue targets that the Juarez Facility along with the two sites that produced components for the Medtronic PFA devices (in Salem, Virginia and Trenton, Georgia) had "their own day" for Operational Site Reviews.

119.    FE1 also described her central role, in advance of each monthly Operational Site Review, in a color-coding process designed to identify for executive management the risk-levels of revenue streams at the Juarez Facility, including those associated with Medtronic's PFA device. FE1 stated that in connection with the monthly reviews, she was responsible for color-coding revenue as either green (low risk), yellow (medium risk), or red (high risk). This was prepared for the current quarter and the upcoming quarter. FE1 prepared the rolling forecast in Excel. The Excel document was then provided and incorporated into a PowerPoint for monthly operational reviews.

120.    When asked when she started placing the Medtronic PFA device revenue in red for Defendant Khales and the other executives to see, FE1 stated that this began by the fourth quarter of 2024 because she was not meeting her numbers for 2024 and there was "no way in holy hell" that she was going to meet the 2025 number without a "lot of changes." As a result, by the end of 2024, executive leadership, including Defendant Khales, began asking questions about the 2025 Medtronic PFA forecast revenue during the monthly Operational Site Reviews. FE1 explained that typically 95% of her revenue forecast for the following quarter would have been supported by a purchase order. Because Integer did not have a purchase order from Medtronic for 2025, roughly 50% of her total forecasted Juarez Facility revenue for 2025 was in red—meaning at risk and not

supported by a purchase order. FE1 confirmed that she explained to Defendant Khales and the other executives that Medtronic was returning devices and was not issuing any more purchase orders. FE1 added, "I included that we did not have [purchase order]s supporting this demand." As FE1 stated, that was when the "red lights were flashing," which executive leadership saw first-hand. FE1 further confirmed her 2025 revenue forecasts continued to show the Medtronic PFA device revenue for 2025 in red throughout the end of her tenure with Integer in July 2025.

121.    FE1 also recounted that the nearly 1,100 units returned around Thanksgiving 2024 were reflected in her weekly reports to her manager, Senior Operations Director Francisco Aguilar ("Aguilar"), which documented the potential revenue impact of the unit returns. FE1 specified that these reports contained actual data and would have been noted in a PowerPoint presentation. Accordingly, these reports were forwarded by FE1's manager upstream to the executive management team. FE1 stated that the authorization to accept the returned products came from discussions between Defendant Khales and the Director of Quality for the Juarez site, Mauro Aldrete. She added that Integer also had a Senior Director of Quality, Pedro Trujillo, who was responsible for several sites. She noted that Defendant Khales was definitely aware of those returns and their subsequent financial impact through meetings with the commercial and quality teams.

122.    FE1 indicated that the lack of purchase orders from Medtronic in the first quarter of 2025 was another issue that was quickly brought to the attention of executive management and communicated to Integer's commercial team. FE1 explained that she communicated Medtronic's non-issuance of purchase orders for 2025 to her manager, Aguilar, who in turn communicated that upward. She noted that Aguilar had meetings with his manager, Vice President of Operations William "Bill" Schrensky, SVP of Operations Gary Lopez, and Defendant Khales. In addition to these meetings, Aguilar had weekly calls with Defendant Khales.

123.    FE1 confirmed that Defendant Khales was "100%" involved in discussions surrounding the Medtronic PFA device and that lack of purchase orders for 2025. FE1 stated that Khales definitely would have stepped in over Medtronic's returned units, and pressure would have been placed on quality executive leadership to engage with Medtronic on the criteria for acceptable and non-acceptable returns. When asked about the reduced demand negotiations with Medtronic in early 2025, FE1 stated that Defendant Khales communicated with his counterpart at Medtronic once he was apprised of how the negotiations were going.

124.    Moreover, FE1 described a variety of databases and systems that executive leadership had access to monitor sales. For example, FE1 stated that executive leadership had access to different modules in their Oracle ERP which tracked actual sales. FE1 specified that, in particular, Oracle ERP's module known as Power BI collected all their data for business analytics which was updated overnight and was available to executive leadership via the Company's intranet. She said that executive leadership could therefore see in this database that only 50% of the Medtronic PFA device revenue was covered by purchase orders, which was highly unusual since forecasts were based on purchase orders, and they typically had no more than 5% of unsecured purchase orders within a three-month period. She added, "By Q4 2024 it was showing that 50% of our revenue [from the Juarez Facility] was not secured by [purchase order]s from Medtronic."

125.    FE2 corroborated FE1's testimony. FE2 explained that Medtronic's decision to sharply reduce orders and that Integer's related decision to shut down its exclusive Medtronic PFA device manufacturing line were known by Integer's executive leadership. FE2 recounted that Integer's executive leadership team, including Defendant Khales, definitely would have been aware that Medtronic was going to slow down production of its Medtronic PFA product. FE2

47

confirmed that any communications from Medtronic on orders and demand for its PFA device would be communicated up to executive management, "especially something of that magnitude"—referring to the sharp reduction in orders that led to the stoppage and then complete shutdown of the Juarez Facility manufacturing line. According to FE2, that communication would be in emails, conference calls, and PowerPoint presentations saved on SharePoint.

126. FE2 also corroborated and expanded on FE1's account of how Integer's monthly operational site reviews with executive management were conducted. FE2 explained that Integer had a process that included monthly PowerPoint presentations to the executive teams on what was happening at each manufacturing site. These reports included all the numbers for the month on what they did and what they had planned. FE2 added that the monthly report also included any issues that a site experienced which may affect its forecasting. FE2 also corroborated that in preparation for these meetings, forecasted revenue was marked green (low risk), yellow (medium risk) or red (high risk).

127. Moreover, FE2 knew that Defendants Dziedzic and Khales and the rest of the executive management team were involved in weekly meetings concerning the Company's manufacturing sites—including the Juarez Facility—wherein revenue issues for each site were discussed. FE2 was aware of these meetings because she had the responsibility of preparing documents for them concerning any supply issues facing the Company's manufacturing sites, and she understood that the meetings also covered revenue issues. She commented, "They [executive management] were constantly talking about what was happening at the plants on a weekly basis."

128. FE2 further confirmed that senior executive leadership would have known about, and been involved in, the decision to shut down Integer's entire manufacturing line for Medtronic's PFA device. FE2 stated that the executive leadership team would have made the decision to lay

off over one hundred people at the Juarez Facility, which took place in July 2025, and confirmed the layoffs were "directly related to Medtronic's slow-down."

129.    FE3 corroborated these issues recounted by FE1 and FE2. FE 3 stated that when she started working at Medtronic in August 2023, Affera was already approved and being sold in Europe. The plan in the U.S. was to ramp up production of Affera in advance of its regulatory approval, so Medtronic would be able to meet demand once it was ready for its U.S. commercial launch. Medtronic's original plan was to manufacture the Affera device in-house using Affera's existing plant in Burlington, Massachusetts, which focused exclusively on Affera. FE3 advised that Medtronic's goal was to manufacture 3,000 to 4,000 units per month in preparation for Affera's U.S. launch. However, FE3 recalled that, while Medtronic initially thought it could manufacture the device in-house, the device was so technologically complicated that Medtronic could only manufacture fifty Affera units per week, far below its targeted goal. Consequently, FE3 advised that Medtronic decided to outsource the subassembly of most of Affera to a large and well-known contract medical device manufacturer in China.

130.    FE3 further noted that, in addition to using Chinese contract manufacturers, Medtronic also directed subassemblies to Medtronic's site in Ireland for supply in Europe. FE3 stated that Medtronic's Ireland site used the same Chinese contract manufacturer. When FE3 was asked whether Integer had anything to do with manufacturing the Affera device, FE3 answered "no, never." FE3 added that she had never even heard of Integer.

131.    FE4, another employee working on Affera, was similarly unfamiliar with Integer and was not aware of Integer doing any contract manufacturing or assembly for Medtronic's Affera mapping and ablation system.

132.    FE5 also indicated that she was not aware of Integer doing any contract

49

manufacturing work for Medtronic's Affera mapping and ablation system.

133.    FE6 likewise indicated that she was unfamiliar with Integer and she was not aware of the Company being a contract manufacturer for Medtronic's Affera mapping and ablation system.

134.    FE7 similarly indicated an unfamiliarity with Integer, and was not aware of Integer doing any contract manufacturing work on Medtronic's Affera mapping and ablation system.

*Insider Sales*

135.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Dziedzic, Hobby, Spence, and Maxwell sold shares of the Company's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

136.    While the Company's stock price was artificially inflated, Defendant Dziedzic sold 338,975 shares of Integer common stock, totaling proceeds of approximately $41.7 million. Defendant Dziedzic made the following sale of Integer stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| May 1, 2025 | 338,975 | $123.17 | $41,751,550.75 |

137.    While the Company's stock price was artificially inflated, Defendant Hobby sold 11,960 shares of Integer common stock, totaling proceeds of approximately $1.4 million. Defendant Hobby made the following sale of Integer stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| July 31, 2024 | 11,960 | $119.66 | $1,431,133.60 |

138.    While the Company's stock price was artificially inflated, Defendant Spence sold 14,739 shares of Integer common stock, totaling proceeds of approximately $1.7 million.

Defendant Spence made the following sale of Integer stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| June 4, 2025 | 14,739 | $120.38 | $1,774,280.82 |

139. While the Company's stock price was artificially inflated, Defendant Maxwell sold 8,720 shares of Integer common stock, totaling proceeds of approximately $1 million. Defendant Maxwell made the following sale of Integer stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| June 5, 2025 | 8,720 | $120.56 | $1,051,283.20 |

140. As a result of these insider sales, Defendants Dziedzic, Hobby, Spence, and Maxwell were unjustly enriched.

***Harm to the Company***

141. As a direct and proximate result of the Individual Defendants' misconduct, Integer has lost and expended, and will lose and expend, millions of dollars.

142. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Dziedzic, Smith, and Khales, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

143. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

144. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

145. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

51

breaches of fiduciary duties by the Individual Defendants.

146.    Plaintiff will adequately and fairly represent the interests of Integer and its shareholders in enforcing and prosecuting its rights.

147.    Integer is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

148.    Plaintiff is a current shareholder of Integer and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

149.    A pre-suit demand on the Board of Integer is futile and, therefore, excused. At the time this action was commenced, the thirteen-person Board consisted of Individual Defendants Khales, Antrum, Bailey, Capps, Coyle, Hinrichs, Hobby, Jeffers, Maxwell, Passerini, and Spence (the "Director Defendants") and non-parties James Flanagan ("Flanagan") and Aaron Kapito ("Kapito," and together with Flanagan and the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that seven Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

150.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

151.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

152.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

153.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Integer, the Director Defendants knew, or should have known, the material facts surrounding Integer's financial condition and internal control mechanisms.

154.    Defendant Khales is not disinterested or independent. In addition to serving as a director, Defendant Khales also serves as the Company's President and CEO. Thus, as conceded in the Company's proxy statement filed on April 6, 2026, on Schedule 14A with the SEC, Defendant Khales is a non-independent director. Furthermore, Defendant Khales is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period. Accordingly, demand upon Khales is futile, and thus excused.

155.    Moreover, Director Defendants Antrum, Bailey, Capps, Coyle, Hinrichs, Hobby, Jeffers, Maxwell, Passerini, and Spence each solicited the materially false and misleading 2025 Proxy.

156.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

157.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

158.    Defendants Antrum, Coyle, Hinrichs, Jeffers, Maxwell, and Passerini (the "Audit Defendants") served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

159.    The Director Defendants, as members of the Board, were and are subject to the

Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

160.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

161.    Moreover, none of the Directors have taken remedial action to redress the conduct alleged herein.

162.    The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgement as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgement about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

163.    Furthermore, Individual Defendants Dziedzic, Hobby, Spence, and Maxwell received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

55

164. The acts complained of herein constitute violations of fiduciary duties owed by Integer's officers and directors, and these acts are incapable of ratification.

165. Thus, for all the reasons set forth above, the Director Defendants are unable to consider a demand with the requisite disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### Against the Individual Defendants for Violations of § 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

168. Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

169. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

170. The Individual Defendants, individually and in concert, disseminated and/or

56

permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to its EP products.

171. The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Individual Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Individual Defendants Antrum, Bailey, Capps, Dziedzic, Hinrichs, Hobby, Jeffers, Maxwell, Passerini, and Spence to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

172. As a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy, the Company has sustained significant damages.

173. Plaintiff, on behalf of Integer, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

174. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

176. Each of the Individual Defendants violated and breached their fiduciary duties of

care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

177.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) Integer's growth was heavily driven by, and dependent on, a single EP product customer and its PFA device orders; (ii) Integer was struggling to ramp up its manufacturing of PFA devices including, but not limited to, the PulseSelect device for Medtronic; (iii) Integer faced significant delays in PFA device production and could not meet the demand for its EP products, including the purchase order from Medtronic; (iv) Integer's produced PFA devices suffered from serious defects that led to their return; (v) demand for Integer to manufacture PFA devices had dissipated; (vi) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

179.    The Individual Defendants had actual knowledge that the Company was engaging

in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

180. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

181. Furthermore, four of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the Company's stock was artificially inflated, netting millions of dollars in proceeds for themselves.

182. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

183. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

184. Plaintiff, on behalf of Integer, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

187.    Plaintiff on behalf of Integer has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

188.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Integer.

190.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Integer that was tied to the performance or artificially inflated valuation of Integer, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

191.    Plaintiff, as a shareholder and a representative of Integer, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other

compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

192. Plaintiff on behalf of Integer has no adequate remedy at law.

<u>COUNT V</u>

**Against the Individual Defendants for Waste of Corporate Assets**

193. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

195. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

196. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

197. Plaintiff, on behalf Integer, has no adequate remedy at law.

<u>COUNT VI</u>

**Against Individual Defendants Dziedzic, Smith, and Khales for
Contribution Under Section 10(b) and 21D of the Exchange Act**

198. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

199. The Company and Individual Defendants Dziedzic, Smith, and Khales are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Section 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder

61

by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to the Individual Defendants Dziedzic's, Smith's and/or Khales' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

200.    Defendants Dziedzic, Smith, and Khales, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

201.    Accordingly, Defendants Dziedzic, Smith, and Khales are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

202.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Dziedzic, Smith, and Khales.

203.    Plaintiff, on behalf of Integer, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing Integer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: May 6, 2026                    **RIGRODSKY LAW, P.A.**

By:  */s/ Vincent A. Licata*
Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
Email: lw@rl-legal.com

63

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com